IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD P. O'DONNELL and MICHELLE O'DONNELL, Plaintiffs | : | No. 4:06-CV-1068 |
| | : | Judge John E. Jones III |
| v. | : | |
| NEW ENGLAND MOTOR FREIGHT, INC., Defendant and Third-Party Plaintiff | : | |
| v. | : | |
| TRANSFORCE, INC., Third-Party Defendant and Fourth-Party Plaintiff | : | |
| v. | : | |
| TRANSPORT LEASING/CONTRACT, INC., Fourth-Party Defendant | : | |

**MEMORANDUM**

March 13, 2009

In this personal injury action, plaintiff Edward O'Donnell and his wife Michelle, assert claims of negligence and loss of consortium against defendant New England Motor Freight, Inc. ("NEMF") arising out of injuries O'Donnell sustained in a June 16, 2004 accident at NEMF's truck terminal in Lehighton, Pennsylvania. NEMF filed a third-party complaint (Doc. 37) against Transforce,

Inc., asserting claims of indemnification, contribution, and breach of contract. Transforce asserted counterclaims of indemnification, contribution, negligence, and breach of contract against NEMF (Doc. 39) and filed a fourth-party complaint (Doc. 41) against Transport Leasing/Contract, Inc. ("TLC"), asserting claims of indemnification and breach of contract.

This matter is currently before the Court on the motions for summary judgment of Transforce (Doc. 105) and TLC (Doc. 73), both of which argue that all defendants are immune from suit under the Pennsylvania Workers' Compensation Act, 77 Pa. C.S. § 1, *et seq.*, because O'Donnell was a borrowed servant of NEMF. Transforce and TLC also argue that they are entitled to judgment as a matter of law on the respective indemnification and breach of contract claims against them because their actions were not the proximate cause of any injury to O'Donnell. Although not formally moving for summary judgment itself, NEMF joins Transforce and TLC's argument that O'Donnell's claims are barred by the Workers' Compensation Act, while opposing the rest of Transforce's motion. The plaintiffs' oppose both motions, arguing that O'Donnell was not a borrowed servant of NEMF.

For the reasons set forth below, the Court finds that O'Donnell was a borrowed servant and therefore will grant both motions for summary judgment and enter judgment in favor of all defendants and against the plaintiffs.[1]

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex* , 477 U.S. at 323. The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the

[1] Summary judgment may granted in favor of NEMF despite the lack of a formal motion because on the present motions the Court already is engaged in determining whether a genuine issue of material fact exists, both the plaintiffs and NEMF were clearly on notice of the borrowed servant issue, and both took advantage of the opportunity to present evidence and argument. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (observing "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 2008); 11 James Wm. Moore *et al.*, Moore's Federal Practice § 56.10[2][b] (3d ed. 2008).

non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## II. BACKGROUND

NEMF is a trucking company with a terminal in Lehighton, Pennsylvania. (Hardy Dep. 1626-27; Hillman Dep. 1625.)[2] Transforce is a staffing company that leases drivers to the transportation industry. (Heinly Dep. 15-16; Abbott Dep. 6.) TLC is a professional employer organization that handles payroll, workers' compensation insurance, and other human resources functions for its clients. (Clark Dep. 29.) At all relevant times, NEMF and Transforce were parties to an agreement whereby Transforce would supply NEMF with temporary drivers during peak business periods. (*See* Labor Services Agreement; Heinly Dep. 25-29; Hardy Dep. 1629-31; Hillman Dep. 1640.) Transforce, in turn, contracted with TLC to screen and perform background checks on potential employees. (*See* TLC Exclusive Service Agreement; Heinly Dep. 37-38.)

Transforce considered leased drivers to be its employees, in the common sense of the word. (Heinly Dep. 29, 70-71, 89.) A potential Transforce driver

---

[2] Because varying excerpts of many of the relevant depositions were placed in the record by different parties, all such citations are to the page numbers of the deposition transcripts, rather than the CM/ECF document pages.

would complete and submit a TLC application form, after which TLC would conduct a background check of the applicant, and, if TLC approved the applicant as meeting Transforce's qualifications, he would be given a drug test. (*Id.* at 36-38, 47-50, 102-04.) Leased drivers were paid by Transforce (although the payroll was done and checks were issued by TLC), and also received benefits through Transforce. (*Id.* at 29-31, 38-39.) Transforce had the power to terminate a driver's employment. (*Id.* at 35.)

David Hillman, manager of the NEMF Lehighton terminal, and Larry Heinly, manager of the Transforce branch office in Reading, Pennsylvania, agreed on the rates that NEMF would pay to Transforce for leased drivers filling two type of positions: drivers making deliveries to and from the terminal and "yard jockeys", which are drivers that move trailers around the terminal.[3] (Heinly Dep. 30, 73-74; Hillman Dep. 1630.) When NEMF needed a driver to fill a position, it would contact Transforce and provide a description of the assignment and anticipated hours. (Heinly Dep. 34-35, 95-96; Hillman Dep. 1630.) Heinly, with the approval of his supervisor, would determine which driver to provide for a

---

[3] "A yard jockey is a person who hooks and unhooks trailers, pulls them away from the docks, puts them in the yard loaded, grabs an empty, brings it back into the terminal and, again unhook[s] it for the purposes of it to be loaded." (O'Donnell Dep. 40.) *See also Smith v. ABF Freight Sys., Inc.*, C.A. No.1:04-CV-2231, 2007 WL 3231969, at *1 n.3 (M.D. Pa. Oct. 29, 2007) (describing the duties of a yard jockey).

particular assignment. (Heinly Dep. 31-32, 95-96.) If a driver did not like an assignment, Transforce would attempt to accommodate his request for a different one. (*Id.* at 32-33.)

If a driver was provided to NEMF, NEMF would determine his work assignments and direct the performance of his job duties. (Heinly Dep. 89-90, 101-02; Hardy Dep. 1680-81.) Neither Transforce nor TLC assigned duties to a leased driver or directed his work. (Heinly Dep. 90, 103-04.) An NEMF supervisor would approve a leased driver's time cards, which were then sent to Transforce for payment. (Heinly Dep. 30; Hillman Dep. 1647-48.) Although it could not terminate a leased driver's employment with Transforce, NEMF could terminate the driver's assignment with NEMF. (Heinly Dep. 35-36, 90, 117-18.)

In the middle of May 2004, Edward O'Donnell responded to a Transforce newspaper advertisement for local drivers. (O'Donnell Dep. 12; Heinly Dep. 44.) He was mailed an application, which he received and completed on June 7, 2004. (O'Donnell Dep. at 31-32; Heinly Dep. 44.) The next day, O'Donnell met with Heinly, gave him the application, and discussed job opportunities with Transforce. (O'Donnell Dep. at 33; Heinly Dep. 44-46.) Soon thereafter, Heinly called O'Donnell and asked him if he was interested in a yard jockey assignment with NEMF. (O'Donnell Dep. 40; Heinly Dep. 51.) O'Donnell said he was. (Heinly

Dep. 51.) Heinly then informed Hillman he had someone to fill the position. (*Id.*; Hillman Dep. 1634-35.)

On June 14, 2006, O'Donnell reported to NEMF's Lehighton terminal. (O'Donnell Dep. 45; Hillman Dep. 1634.) Although the essential facts are undisputed, different individuals characterize differently what occurred next. Heinly recalls that, when he informed Hillman that he had someone to fill the yard jockey position, Hillman stated that he wanted to interview the driver and give him a driving test, and Heinly relayed this information to O'Donnell. (Heinly Dep. 52; O'Donnell Dep. 43.) Hillman recalls that he greeted O'Donnell and almost immediately passed him off to Tom Mertz, the operations manager at the terminal. (Hillman Dep. 1636-37.) Hillman states that he did not ask O'Donnell any questions because Heinly "told me he had two qualified guys he was sending over that day. So I go under the assumption that they are qualified." (*Id.* at 1638.) Hillman states that he did not conduct interviews of drivers sent by Transforce because Transforce was to have already interviewed them, and the drivers were supposed to be ready to work when they arrived. (*Id.* at 1652.) O'Donnell states that, upon arrival, he had an "interview" with a manager whose name he does not remember. (O'Donnell Dep. 45.) This "interview" consisted of the manager explaining the duties of the yard jockey position, how to perform those duties,

what the hours would be, and that after six months O'Donnell could be considered for a full-time position with NEMF. (*Id.* at 46-49.)

Again, although the facts are not in dispute, characterizations of what occurred next vary. O'Donnell states that the manager went "to flag down the current yard jockey who was on his shift and he would take me out for the test to see how well I could back up trailers." (O'Donnell Dep. 49.) Wilbur Green, the yard jockey on duty at the time, states that Mertz asked him "to take Mr. O'Donnell and show him the operations of the yard horse[4] and have him back in some trailers to see if he ... could do it." (Green Dep. 1653.) Hillman states that NEMF conducted no testing or training for individuals assigned to work as yard jockeys because they were expected "to be able to do everything off the bat." (Hillman Dep. 1639-40, 1673-75.) However, a new yard jockey would be shown how to use the yard horse because its controls are slightly different than a standard tractor, and therefore, Hillman expected that the yard jockey on duty would show O'Donnell how to operate the yard horse. (*Id.* at 1639-40.)

---

[4] A yard horse, also known as a yard mule or spotter, is a small tractor used to move semi-trailers around the terminal yard. *See* Research and Innovative Technology Administration, Bureau of Transportation Statistics, Dictionary, http://www.bts.gov/dictionary/index.xml; *see also Smith*, 2007 WL 3231969 at *1 n.3.

However it is characterized[5], Green showed O'Donnell how to operate the yard horse. O'Donnell also operated the yard horse himself, although he and Green disagree as to how well he did so. O'Donnell states that he "aced it" by successfully backing a trailer into a dock three or four times and that he "passed more or less the first part of the test." (O'Donnell Dep. 57, 59.) Green states that O'Donnell tried twice to back a trailer into a dock, but was unsuccessful, backing into the building and another trailer. (Green Dep. 1658, 1709-10.) O'Donnell testified that Green then said he would show him how to back a trailer into a particularly difficult dock. (O'Donnell Dep. 59, 60.) Green testified that after O'Donnell was unsuccessful at operating the yard horse, he stated that he would demonstrate how to do so. (Green Dep. 1659.) For whatever reason, Green began using the yard horse to back a trailer into a dock, and O'Donnell, who was standing on the back of the yard horse, became pinched between the yard horse and the trailer, and was injured.[6] (*See* O'Donnell Dep. 59-69; Green Dep. 1659-69.) After the accident, O'Donnell applied for and received workers' compensation benefits from TLC. (O'Donnell Dep. 27-28; Ardell Dep. 81-82.)

---

[5] Transforce and TLC describe it as "training." The plaintiffs describe it as a "test." NEMF denies both of these characterizations.

[6] The degree of O'Donnell's injuries and the extent to which they were caused by this accident are disputed, but this dispute is not material to the present motions.

## III. DISCUSSION

Although the parties raise other matters, the dispositive issue presented is whether O'Donnell was a borrowed servant of NEMF. The purpose of the Pennsylvania Workers' Compensation Act is "to provide payment to the injured worker commensurate with the damage from accidental work-related injury, as a fair exchange for the surrender of every other right of action against the employer." *Commonwealth v. Corban Corp.*, 957 A.2d 274, 277 (Pa. 2008). Thus, "[t]he Workers' Compensation Act is the exclusive means for obtaining compensation for injuries which has been substituted for common law tort actions between employees and employers. The Act restricts the remedies available to an employee for injuries sustained in the course of employment and closes to the employee any recourse against the employer at common law for negligence." *Shick v. Shirey*, 716 A.2d 1231, 1237 (Pa. 1998); *see* 77 Pa. C.S. § 481.

The Act defines "employer" as synonymous with the common-law concept of "master," 77 Pa. C.S. § 21, and defines "employee" as synonymous with the common-law concept of "servant," including "[a]ll natural persons who perform services for another for a valuable consideration, exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer," *id.* at § 22. An entity may also be considered an employer for

purposes of the Act, and thus immune from common law liability under § 481, if an employment relationship was created when it "borrowed" the injured employee.

The Pennsylvania Supreme Court in *JFC Temps, Inc. v. Workers' Compensation Appeal Board*, 680 A.2d 862 (Pa. 1996), comprehensively described this "borrowed servant" doctrine:

> The law governing the "borrowed" employee is well-established. The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these factors guides the determination, each case must be decided on its own facts.

*Id.* at 864 (citations omitted). Although courts have looked to numerous principles in determining whether an employee is a borrowed servant, *see Daily Express, Inc. v. Workers' Compensation Appeal Board*, 406 A.2d 600, 601-02 (Pa. Commw. Ct. 1979), "the right to control the performance of the work is the overriding factor," *JFC Temps*, 680 A.2d at 865. The question of whether an employer-employee relationship exists is one of law. *Id.* at 864.

The undisputed facts of this case establish that, for purposes of the Workers' Compensation Act, NEMF was O'Donnell's employer. After TLC reviewed O'Donnell's qualifications, Transforce assigned him to NEMF, but the involvement of these two entities' in O'Donnell's employment essentially ends there. O'Donnell reported to NEMF supervisors at NEMF's facility and used equipment supplied by NEMF. No representative of Transforce or TLC was ever present at the Lehighton terminal. NEMF determined O'Donnell's work hours and assignments and would approve his time cards. Although NEMF could not discharge O'Donnell from employment with Transforce, it could terminate his assignment. Most importantly, it is undisputed that NEMF had the right to control the work O'Donnell did and the performance of that work. Under these circumstances, the Court finds that O'Donnell was an employee of NEMF for purposes of the Workers' Compensation Act. This holding is in accord with the numerous analogous Pennsylvania decisions finding leased drivers to be the borrowed servants of the entity for whom they drive rather than the entity assigning the driver to the position. *See, e.g.*, *id.* at 864-65, 866 (citing *Paul Arpin Van Lines v. W.C.A.B.*, 609 a.2d 906 (Pa. Commw. Ct. 1992) and *Wilkinson v. K-Mart*, 603 A.2d 659 (Pa. Super. Ct. 1992)); *Red Line Express Co. Inc. v. W.C.A.B.*,

588 A.2d 90 (Pa. Commw. Ct. 1991); *Supp v. Erie Ins. Exch.*, 479 A.2d 1037 (Pa. Super. Ct. 1984); *Lego v. Commonwealth*, 445 A.2d 1324 (Pa. Commw. Ct. 1982).

The plaintiffs argue that there is at least a disputed issue of material fact as to whether O'Donnell was a borrowed servant because Transforce considered O'Donnell its employee and because Transforce determined where he was assigned, paid him, and could accommodate drivers' assignment requests. However, "[i]t is well settled under Pennsylvania law that parties are not bound by their characterization of the employee-employer relationship." *Zaragoza v. BASF Constr. Chem. LLC*, C.A. No. 08-96, 2009 WL 260772, at *4 (E.D. Pa. Feb. 3, 2009) (citing *Red Line*, 588 A.2d at 94). Thus, even if Transforce considered O'Donnell its employee (and it clearly did so only in the common meaning of the word), that characterization is not determinative of the borrowed servant question. Moreover, although some factors, such the ability of Transforce to terminate O'Donnell and select him for a particular position, weigh against finding that he was a borrowed servant, the overriding factor – the right to control the performance of O'Donnell's work – weighs heavily in favor of finding that NEMF was a borrowing employer. *See JFC Temps*, 680 A.2d at 865.

The plaintiffs also argue that NEMF cannot be deemed O'Donnell's employer because his employment was conditioned on passing the yard jockey

"test" and, having failed to complete the "exam", he was never "hired" by NEMF. Even accepting the plaintiffs' characterization of the incident as occurring during a test upon which O'Donnell's assignment at NEMF was conditioned, this argument fails because it misconstrues the law regarding the borrowed servant inquiry. For the borrowed servant doctrine to apply, there is no requirement that there be a contract of hire, either expressed or implied, between the borrowing employer and the borrowed employee. *George v. GPU Nuclear Corp.*, 910 F. Supp. 180, 185-86 (M.D. Pa. 1995) (citing *English v. Lehigh County Auth.*, 428 A.2d 1343 (Pa. Super. Ct. 1981)). It need only be established that O'Donnell was "working under some kind of contractual duty" rather than "acting as a mere volunteer or simply for the 'fun of it.'" *English*, 428 A.2d at 1353; *see also* 77 Pa. C.S. § 22 (defining employee as "[a]ll natural persons who perform services for another for a valuable consideration"). O'Donnell, of course, was not volunteering at NEMF. He showed up to perform services and expected to be paid for doing so. Thus, it is irrelevant whether NEMF had formally "hired" O'Donnell or that O'Donnell was injured during an "interview" or "test." *See Kirk v. Commonwealth*, 442 A.2d 1234, 1235-36 (Pa. Commw. Ct. 1982) (holding employment relationship existed where plaintiff was injured during orientation which occurred three days before he was scheduled to begin job). NEMF had the

right to control the performance of O'Donnell's work at the time of the accident. This is the relevant inquiry and why the Court finds NEMF to be a borrowing employer. *See Virtue v. Square D Co.*, 887 F. Supp. 98, 102 (M.D. Pa. 1995) (emphasizing that control over the employee's work and its performance *at the time of the accident* is the "crucial consideration").

Because NEMF was O'Donnell's employer for purposes of the Workers' Compensation Act, the plaintiffs' claims against NEMF are barred by § 481. The claims for contribution and indemnification between NEMF, Transforce, and TLC are therefore moot. For these reasons, the Court will grant Transforce and TLC's motions for summary judgment and enter judgment against the plaintiffs and in favor of the defendants. An appropriate order will be entered.